## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

HALSTEAD NEW ENGLAND CORPORATION, METROFLOR CORPORATION, and SHOPHMTX LLC,

Plaintiffs,

v.

UNITED STATES OF AMERICA; KRISTI NOEM, *in her official capacity as Secretary of Homeland Security*; UNITED STATES CUSTOMS AND BORDER PROTECTION; SCOTT BESSENT, *in his official capacity as Secretary of Homeland Security*; UNITED STATES DEPARTMENT OF TREASURY; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; HOWARD LUTNICK, *in his official capacity as Secretary of Commerce*; UNITED STATES DEPARTMENT OF COMMERCE; RODNEY S. SCOTT, *in his official capacity as Commissioner of United States Customs and Border Protection*; JAMIESON GREER, *in his official capacity as the United States Trade Representative*; and OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE,

Defendants.

Case No.: 1:25-cv-00908

**COMPLAINT**

Plaintiffs Halstead New England Corporation, Metroflor Corporation, and shopHMTX LLC ("Plaintiffs") by and through their undersigned counsel, bring this civil action against Defendants and allege as follows:

## INTRODUCTION

1.       Plaintiffs commence this action to obtain relief in the form of a refund of import duties imposed by certain Executive Orders and paid by Plaintiffs, should those tariffs be determined to be unauthorized.

2.       Legal challenges to tariffs on goods originating from a range of countries, including China, Mexico, Vietnam, South Korea, Thailand and Cambodia, among others, are currently pending before the Supreme Court of the United States. *See Learning Resources, Inc. v. Trump*, *cert. granted before judgment*, No. 24-1287, 2025 WL 2601021 (U.S. Sept. 9, 2025); *Trump v. V.O.S. Selections, Inc.*, *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025).  Lower courts have determined that these tariffs, imposed pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, were not authorized. *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025); *Learning Resources, Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025).  However, the scope of available and appropriate relief in those challenges is in dispute.  Indeed, while the Federal Circuit ruled on the merits that the tariffs are not authorized, it remanded the question of the appropriate injunctive relief to the Court of International Trade. *See V.O.S. Selections*, 149 F.4th at 1339-40.  This raises the possibility that, even if the pending legal challenges result in findings that the tariffs were not authorized, the decisions may not directly order a refund of duties paid by Plaintiffs.

3.       Accordingly, Plaintiffs bring this action to ensure that, in the event these tariffs are found to be unauthorized, it can obtain a judgment ordering the refund of duties that Plaintiffs paid and further ordering that these tariffs not be collected on any future imports.

## JURISDICTION

4.       The Court has subject matter jurisdiction under 28 U.S.C. § 1581 because this action is commenced against an officer of the United States and arises out of an Executive Order providing for tariffs. 28 U.S.C. § 1581(i)(1)(B); *see Solfa Solar, Inc. v. United States*, 296 F. Supp. 3d 1296, 1299 (Ct. Int'l Trade 2018); *V.O.S. Selections, Inc.*, 149 F.4th at 1328-30.

5.       The Court possesses all the powers in law and equity of, or as conferred by statute upon, a district court of the United States. 28 U.S.C. § 1585.  The Court may enter a money judgment for or against the United States in any civil action commenced under 28 U.S.C. § 1581 or 28 U.S.C. § 1582 and may also order any other form of relief that is appropriate in a civil action. 28 U.S.C. §§ 2643(a)(1), (c)(1).

## PARTIES

6.       Plaintiffs Halstead New England Corporation, Metroflor Corporation, and shopHMTX LLC are related corporate entities that manufacture luxury vinyl tile ("LVT") flooring for a diverse cross-section of customers in the construction and renovation markets.  Plaintiffs import LVT planks and tiles, homogenous and heterogenous sheet vinyl, and other resilient floor products from countries around the world, including China, Mexico, Vietnam, South Korea, Thailand, and Cambodia.

7.       Defendant the United States of America is the federal government of the United States of America.

8.       Defendant Kristi Noem, in her official capacity, is the Secretary of Homeland Security.  She is responsible for implementing (i) Exec. Order No. 14257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15041 (April 2, 2025) (as amended, the "Reciprocal Tariff Order");  (ii) Exec. Order No. 14195, *Imposing Duties to Address the Synthetic*

*Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9121 (Feb. 1, 2025) (as amended, the "China Fentanyl Tariff Order"); and (iii) Executive Order No. 14194, *Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 9117 (Feb. 1, 2025), (as amended, the "Mexico Tariff Order" and, together with the Reciprocal Tariff Order and the China Fentanyl Tariff Order, the "Challenged Orders"), which all relied on IEEPA to impose tariffs on U.S. trading partners around the world. She is also responsible, through the Department of Homeland Security's component, United States Customs and Border Protection, for administering and collecting tariffs directed by the Challenged Orders.

9.     Defendant United States Customs and Border Protection is responsible for administering and collecting tariffs directed by the Challenged Orders.

10.     Defendant Scott Bessent, in his official capacity, is the Secretary of the Treasury. He is responsible for consulting on implementation of tariffs directed by the Challenged Orders.

11.     Defendant United States Department of the Treasury is responsible for consulting on implementation of tariffs directed by the Challenged Orders.

12.     Defendant United States Department of Homeland Security is responsible for implementing the Challenged Orders. It is also responsible, through its component, United States Customs and Border Protection, for administering and collecting tariffs directed by all the Challenged Orders.

13.     Defendant Howard Lutnick, in his official capacity, is the Secretary of Commerce. He is responsible for implementing tariffs directed by the Challenged Orders.

14.     Defendant United States Department of Commerce is responsible for implementing tariffs directed by the Challenged Orders.

15.    Defendant Rodney S. Scott, in his official capacity, is the Commissioner of Customs and Border Protection.  He is responsible for administering and collecting tariffs directed by the Challenged Orders.

16.    Defendant Jamieson Greer, in his official capacity, is the United States Trade Representative.  He is responsible for implementing tariffs directed by the Challenged Orders.

17.    Defendant the Office of the United States Trade Representative ("USTR") is responsible for implementing tariffs directed by the Challenged Orders.

## STANDING

18.    To establish Article III standing, a plaintiff must show injury in fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992).  Plaintiffs are harmed by the Challenged Orders because Plaintiffs have imported and continues to import goods subject to tariffs imposed by the Challenged Orders and, therefore, have paid and would be required to continue paying these tariffs to the U.S. government. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III."); *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 599 (2007) ("being forced to pay" money to the government "causes a real and immediate economic injury").  An order from this Court requiring refund of the duties paid will redress these injuries by reversing the costs incurred by Plaintiffs' business.  Declaratory and injunctive relief will further redress these injuries because Plaintiffs will no longer be required to pay the tariffs on future imports.

## BACKGROUND & FACTUAL ALLEGATIONS

### A.  The Reciprocal Tariff Order

19.    On April 2, 2025, the President issued an Executive Order imposing tariffs on goods originating in virtually all countries.  *See* the Reciprocal Tariff Order (previously defined as Exec.

Order No. 14257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (April 2, 2025), as amended). The express stated goal of these tariffs is "to rebalance global trade flows." *Id.* at 15,045.

20.    The Reciprocal Tariff Order declares that the "large and persistent annual U.S. goods trade deficits" are a "national emergency" because they "constitute an unusual and extraordinary threat to the national security and economy of the United States." *Id.* at 15,041.

21.    The Reciprocal Tariff Order finds that these trade deficits have "led to the hollowing out of our manufacturing base; inhibited our ability to scale advanced domestic manufacturing capacity; undermined critical supply chains; and rendered our defense-industrial base dependent on foreign adversaries." *Id.* at 15,041.

22.    Based on this newly declared national emergency, the Reciprocal Tariff Order specifically imposes "an additional *ad valorem* duty" of 10 percent "on all imports from all trading partners" except for countries and products as expressly excluded. *Id.* at 15,045. The Order also imposes a country-specific tariff rate on 57 trading partners, including China, Vietnam, South Korea, Thailand, and Cambodia. *Id.* at 15,045, 15,049-50. Taken together, these tariffs are referred to as the "Reciprocal Tariffs." The Reciprocal Tariff Order modifies the Harmonized Tariff Schedule of the United States ("HTSUS") accordingly. *Id.* at 15,047.

23.    The 10 percent universal tariffs took effect on April 5, 2025. *Id.* at 15,045, 15,047.

24.    The Reciprocal Tariff Order imposes an adjusted *ad valorem* duty of, for example, 46 percent on imports from Vietnam, 25 percent on imports from South Korea, and 34 percent on imports from China. *Id.* at 15,049. The Reciprocal Tariff Order modifies the HTSUS accordingly. *Id.* at 15,047.

25.     These country-specific tariff rates were calculated not by reference to the rates these countries charge the United States.  Rather the tariff rate for a specific country is calculated by dividing the United States's trade deficit with that country by total imports from that country, and then dividing by two.[1]

26.     These country-specific tariff rates were set to take effect on April 9, 2025. Order, 90 Fed. Reg. at 15,045.

27.     On April 8, 2025, the President issued Executive Order No. 14,259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports from the People's Republic of China*, Fed. Reg. 15509 (April 8, 2025), raising the Reciprocal Tariff rate on imports from China to 84 percent.

28.     On April 9, 2025, the President issued Executive Order No. 14266 suspending imposition of the country-specific rates, with the exception of China, until July 9, 2025. Exec. Order No. 14266, *Modifying Reciprocal Tariff Rates To Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15625, at 15626 (April 9, 2025).  That order did not suspend the 10 percent universal tariffs, meaning that the 10 percent rate would apply during that period to goods originating in all of the trading partners covered by the Reciprocal Tariffs. *Id.*

---

[1] *See* Office of the United States Trade Representative, *Reciprocal Tariff Calculation* (publicly available at https://ustr.gov/sites/default/files/files/Issue_Areas/Presidential%20Tariff%20Action/Reciprocal%20Tariff%20Calculations.pdf) (last accessed October 10, 2025); *see also* BBC, *How were Donald Trump's tariffs calculated?* (publicly available at https://www.bbc.com/news/articles/c93gq72n7y1o) (last accessed October 10, 2025).  Indeed, the European Union's weighted average tariff charged to exports from the United States in 2023 was 3.9 percent for agricultural products and 1.0 percent for non-agricultural products, neither even approaching the 20 percent "reciprocal" tariff imposed by the Order. *See* World Trade Organization, *European Union Tariffs and imports: Summary and duty ranges*, publicly available at https://www.wto.org/english/res_e/statis_e/daily_update_e/tariff_profiles/US_e.pdf (last accessed October 10, 2025).

29.     On April 11, 2025, the President clarified that a variety of technological products related to computers, data processing, telecommunications, and electronic components were exempted from the Reciprocal Tariffs.[2]

30.     On May 12, 2025, the President issued Executive Order No. 14298 further modifying the Reciprocal Tariff rate applicable to China—from 125 percent to 34 percent—and temporarily suspending 24 percentage points of the Reciprocal Tariffs on imports from China for 90 days—leaving an effective Reciprocal Tariff rate of 10 percent during that period. Exec. Order No. 14298, *Modifying Reciprocal Tariff Rates to Reflect Discussions With the People's Republic of China*, 90 Fed. Reg. 21831 (May 12, 2025).

31.     On July 7, 2025, the President issued Executive Order No. 14316 extending the suspension of the country-specific rates until August 1, 2025. Exec. Order No. 14316, *Extending the Modification of the Reciprocal Tariff Rates*, 90 Fed. Reg. 30823, at 30823 (July 7, 2025).

32.     On July 31, 2025, the President issued Executive Order No. 14326, which adjusted the country-specific rates, with the exception of China, and further extended their application until seven days after the order. Exec. Order No. 14326, *Further Modifying the Reciprocal Tariff Rates*, 90 Fed. Reg. 37963, at 37963-64 (July 7, 2025).  For example, the Reciprocal Tariff rate for Vietnam was modified to 20 percent, and the Reciprocal Tariff rate for South Korea was modified to 15%. *Id.* at 37964.

33.     On August 11, 2025, the President issued Executive Order No. 14334 extending until November 10, 2025, the Reciprocal Tariff treatment of China-origin goods at the time. Exec. Order No. 14334, *Further Modifying Reciprocal Tariff Rates to Reflect Ongoing Discussions With the People's Republic of China*, 90 Fed. Reg. 39305 (August 11, 2025).

---

[2] *See* Presidential Memorandum, *Clarification of Exceptions Under Executive Order 14257 of April 2, 2025, as Amended* (April 11, 2025).

34.     On November 4, 2025, the President issued Executive Order No. 14358 further extending until November 10, 2026, the Reciprocal Tariff treatment of China-origin goods at the time. Exec. Order No. 14358, *Modifying Reciprocal Tariff Rates Consistent With the Economic and Trade Arrangement Between the United States and the People's Republic of China*, 90 Fed. Reg. 50729 (Nov. 4, 2025).

35.     The only asserted authority for imposing tariffs under the Reciprocal Tariff Order is IEEPA.  No other President has ever imposed tariffs under IEEPA. *See Learning Resources, Inc. v. Trump*, 784 F. Supp. 3d 209, 219 (D.D.C. 2025).

**B.  The China Fentanyl Tariff Order**

36.     On February 1, 2025, the President issued the China Fentanyl Tariff Order (previously defined as Exec. Order No. 14195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9121 (Feb. 1, 2025), as amended). The China Fentanyl Tariff Order imposed an additional 10 percent *ad valorem* tariff on products from China imported on top of any existing duties.

37.     The China Fentanyl Tariff Order declares a national emergency based on the "sustained influx of synthetic opioids" in the U.S. and "the failure of [the Chinese] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs." Chinese Fentanyl Tariff Order at 9122.

38.     On March 3, 2025, the President issued Executive Order No. 14,228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11463 (March 3, 2025), which increased the additional tariffs on imports from China to 20 percent.

39.    On November 4, 2025, the President issued Executive Order No. 14357, *Modifying Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 50725 (Nov. 4, 2025), which decreased the additional tariff on imports from China back to the original 10 percent rate set by Executive Order No. 14195.

**C.  The Mexico Tariff Order**

40.    On February 1, 2025, the President issued the Mexico Tariff Order (previously defined as Executive Order No. 14194, *Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 9117 (Feb. 1, 2025), as amended).  The Mexico Tariff Order imposed an additional 25 percent *ad valorem* tariff on products from Mexico on top of any existing duties.

41.    The Mexico Tariff Order declares a national emergency based on the "influx of illegal aliens and illicit drugs into the United States" and the "the failure of Mexico to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and drugs." *Id.*

42.    On March 2, 2025, the President issued Executive Order No. 14227, *Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11369 (March 2, 2025).

43.    On March 6, 2025, the President issued Executive Order No. 14232, *Amendment to Duties To Address the Flow of Illicit Drugs Across Our Southern Border*, 90 Fed. Reg. 11787 (March 6, 2025), which eliminated the additional tariffs for product imported duty-free as a product of Mexico under the USMCA and lowered the applicable tariff rate on potash to 10 percent.

**D.  Plaintiffs' Importation Under the Challenged Orders**

44.    Since the implementation of the Challenged Orders, Plaintiffs imported goods from various countries subject to the Challenged Orders, including China, Mexico, Vietnam, South Korea, Thailand, and Cambodia.

45.    The imported goods include a variety of resilient floor products including LVT planks and tiles and homogeneous and heterogenous sheet vinyl used in the manufacture of Plaintiffs' products.

46.    Those imports were subject to the tariffs imposed by the Challenged Orders. Indeed, at least some imports from China were subject to tariffs under both the Reciprocal Tariff Order and the China Fentanyl Tariff Order.

47.    In total, Plaintiffs have paid approximately $25 million in tariffs on these imports pursuant to the Challenged Orders in excess of what they would have paid absent the tariffs imposed by the Challenged Orders.

48.    These tariffs have caused Plaintiffs' business to suffer as they have faced unexpected costs.

**E.  Pending Legal Challenges to the Executive Orders**

49.    Two cases, now consolidated, are pending before the Supreme Court of the United States challenging the President's authority to issue various tariff-related Executive Orders (including the Reciprocal Tariff Order, China Fentanyl Tariff Order, Canada Tariff Order, and Mexico Tariff Order) under IEEPA and the Constitution. *See Learning Resources, Inc. v. Trump*, *cert. granted before judgment*, No. 24-1287, 2025 WL 2601021 (U.S. Sept. 9, 2025); *Trump v. V.O.S. Selections, Inc.*, *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025).  Oral argument was held on November 5, 2025.

50.    In *Learning Resources*, educational toy companies brought suit in the District Court for the District of Columbia ("D.C.C.") seeking a declaration that various tariff-related Executive Orders invoking IEEPA to impose tariffs were unlawful and to enjoin the enforcement of several tariff-related Executive Orders. *See Learning Resources, Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025). On May 29, 2025, the D.C.C. issued an order (1) declaring that the Executive Orders were unlawful; (2) declaring that the IEEPA did not authorize the President to impose the related tariffs; and (3) preliminarily enjoining the defendants from collecting the related tariffs from the plaintiffs. *See id.* at 233. The D.C.C. order was appealed to the U.S. Court of Appeals for the D.C. Circuit, but the Supreme Court granted *certiorari* before judgment. *See Learning Resources, Inc. v. Trump*, No. 24-1287, 2025 WL 2601021, at *1 (U.S. Sept. 9, 2025).

51.    Likewise, in *V.O.S. Selections*, various companies and several states[3] brought suit in the Court of International Trade (the "CIT") seeking a declaration that certain Executive Orders invoking IEEPA to impose tariffs were unlawful and to enjoin the enforcement of the same. *See V.O.S. Selections, Inc. v. U.S.*, 772 F. Supp. 3d 1350 (Ct. Intl. Trade 2025). On May 28, 2025, the CIT issued an order declaring that the Executive Orders were unlawful and issued a universal permanent injunction enjoining the operation of the Executive Orders. *See id.* at 1383-84. The CIT order was appealed to the U.S. Court of Appeals for the Federal Circuit. On August 29, 2025, the Federal Circuit, sitting *en banc*, held that the Executive Orders were unlawful, but vacated the universal injunction and remanded for the CIT to determine the appropriate injunctive relief. *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025).[4]

---

[3] The plaintiff-states are Oregon, Arizona, Colorado, Connecticut, Delaware, Illinois, Maine, Minnesota, Nevada, New Mexico, New York, and Vermont.

[4] The Federal Circuit held that the vacatur of the universal injunction was warranted based on the intervening decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (U.S. June 27, 2025). There the Supreme Court vacated a universal injunction preventing enforcement nationwide of the President's Executive Orders allegedly seeking to limit birthright citizenship. The majority held that the proper question for determining the scope of injunctive relief "is not whether

52.    The plaintiffs in *Learning Resources* and *V.O.S. Selections* advance three grounds under which the Executive Orders are unlawful.  First, that IEEPA—the President's asserted authority for the Challenged Orders—does not encompass the power to tariff at all.  Second, that IEEPA does not authorize these specific tariffs because there is no genuine national emergency.  And third, that, if it does authorize these tariffs, IEEPA violates the nondelegation doctrine and is unconstitutional.

## i.    The President's Limited Authority to Levy Tariffs and IEEPA

53.    The Constitution grants Congress the power to "lay and collect Taxes, Duties, Imposts and Excises" and to "regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 1, 3.  "Tariffs are a tax, and the Framers of the Constitution expressly contemplated the exclusive grant of taxing power to the legislative branch[.]" *V.O.S. Selections*, 149 F.4th at 1322.  Tariff-related delegations of congressional authority to the President have been either to impose tariffs in defined circumstances under Title 19 of the United States Code or to negotiate trade agreements subject to Congress's approval.  In either form, the President's power is necessarily circumscribed by the Constitution and limits enacted by Congress.

54.    Absent Congress's authorization, "the President [can] not increase or decrease tariffs, issue commands to the customs service to refuse or delay entry of goods into the country, or impose mandatory import quotas." *Consumers Union of U. S., Inc. v. Kissinger*, 506 F.2d 136, 142-143 (D.C. Cir. 1974).

---

an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer to complete relief to *the plaintiffs before the court*." *CASA*, 606 U.S. at 852 (emphasis in original). Plaintiffs' instant action arises, in part, from the concern that, even if the Challenged Orders are declared to be unlawful in *Learning Resources* and/or *V.O.S. Selections*, under *CASA* relief will be afforded to a group that omits Plaintiffs. Moreover, if the Supreme Court determines that the Challenged Orders are unlawful, there is no reason for Plaintiffs to wait for a separate legal issue to be litigated.  A refund would be extremely significant for Plaintiffs' business operations, and there is no reason to defer such a refund to see if another plaintiff's case could remedy Plaintiffs' harm. The Federal Circuit also determined that the CIT had exclusive jurisdiction over the case. *See V.O.S. Selections*, 149 F.4th at 1328-30.

55.    Through IEEPA, Congress granted the President authority to take specified emergency economic measures during a declared emergency.

56.    IEEPA became law in 1977.  Both the House and Senate committee reports "expressed the view that past Presidents had abused the authority to regulate economic transactions in a national emergency" under a different statute—the Trading With the Enemy Act ("TWEA")— "by using it in circumstances far removed from those that originally gave rise to the declaration of national emergency." Douglas A. Irwin, *Clashing Over Commerce: A History of U.S. Trade Policy*, at 7 n.51 (2017); H. Rep. No. 95-459 (1977); S. Rep. No. 95-466 (1977).

57.    Accordingly, IEEPA provides the President with authority to take specified actions "to deal with any unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a).

58.    Specifically, the President may (1) "investigate, regulate, or prohibit" transactions in foreign exchange, certain transfers of credits or payments, and the importing or exporting of certain currencies or securities;" and (2) "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving" property in which a foreign country or national has an interest; and (3) confiscate property of foreign persons, organizations, or countries that have "planned, authorized, aided, or engaged in . . . [armed] hostilities or attacks against the United States." 50 U.S.C. § 1702(a)(1).

59.    IEEPA limits when the President may exercise these emergency powers, providing that "[t]he authorities granted to the President . . . may only be exercised to deal with an unusual

and extraordinary threat with respect to which a national emergency has been declared . . . and may not be exercised for any other purpose." 50 U.S.C. § 1701(b).

### ii. IEEPA Does Not Encompass the Authority to Levy Tariffs.

60.    The plain language of IEEPA does not give the President authority to impose tariffs. IEEPA does not use the words "tariffs" or "duties," their synonyms, or any other similar terms like "customs," "taxes," or "imposts."  If Congress had intended to delegate to the President the broad power to levy tariffs under the IEEPA, it would have had to clearly say so. *See Biden v. Nebraska*, 600 U.S. 477, 505–06 (2023) (requiring a clear statement from Congress when the interpretation of a provision would have a "question of 'deep economic and political significance' that is central to [the] statutory scheme") (alteration in original) (quoting *King v. Burwell*, 576 U.S. 473, 486, (2015)).

61.    While IEEPA gives the President the power to "regulate . . . [the] importation or exportation" of property, that provision does not encompass the power to tariff.  The power to "regulate" is not the power to "tax." *See Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 201, 6 L.Ed. 23 (1824)(Marshall, C.J.) ("[T]he power to regulate commerce is . . . entirely distinct from the right to levy taxes and imposts.").  In context, "regulate" is in a list of other verbs including "investigate, block during the pendency of an investigation, . . . direct and compel, nullify, void, prevent or prohibit." 50 U.S.C. § 1702(a)(1)(B).  None of these verbs deal with the power to raise revenue or impose taxes.  The distinction between regulation and taxation is underscored by the Securities Exchange Act of 1034 which directs the Securities and Exchange Commission ("<u>SEC</u>") to "regulate the trading of" securities—clearly Congress did not intend to grant the SEC the power to broadly tax trading activity.

62.    When Congress has delegated the President the authority to levy duties or tariffs, it has established express procedural, substantive, and temporal limits on that authority.  For example, Section 122 of the Trade Act of 1974—enacted just before the IEEPA—authorizes the President to impose an "import surcharge . . . in the form of duties . . . on articles imported into the United States" to "deal with large and serious United States balance-of-payment deficits," but those tariffs are capped at 15 percent and can last only 150 days without Congressional approval. 19 U.S.C. § 2132.  For an additional example, Section 301 of the Trade Act of 1974 authorizes an executive officer to impose duties on a foreign country that has been found, after notice and investigation,[5] to have committed unfair trade practices or violated trade agreements with the United States. 19 U.S.C.§ 2411(c).  Unlike these examples, IEEPA sets no such restrictions.

63.    At bottom, Congress has enacted a comprehensive scheme detailing when and how the President may impose tariffs under other statutes—"It would be anomalous for Congress to have painstakingly described the [President's] limited authority, but to have given him, just by implication," nearly unlimited tariffing authority under IEEPA. *See Gonzales v. Oregon*, 546 U.S. 243, 262 (2006).

64.    Historical practice further demonstrates that IEEPA does not encompass the power to levy tariffs.  In the five decades since IEEPA's passage, no President has invoked IEEPA or its predecessor, TWEA, to impose tariffs.  IEEPA has, instead, been understood to authorize only targeted economic sanctions to address an underlying threat to U.S. national security.

65.    The major questions doctrine further confirms that the IEEPA does not grant the authority to levy tariffs.  As explained by the Supreme Court, the doctrine applies in "cases in

---

[5] Section 301 requires the USTR to initiate an investigation, consult with the foreign country regarding the practices being investigated, determine whether the requisite conditions for action have been met, publish its proposed action and the factual findings on which it is based, and allow for public regarding both the proposed investigation and the final action.  *See* 19 U.S.C. §§ 2412, 2413, 2414.

which the history and breadth of the authority asserted" by the government entails "economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (cleaned up).  In such circumstances, there may be a "reason to hesitate before concluding that Congress meant to confer such authority." *Id.* at 732.  These tariffs imposed by the Challenged Orders are of indisputable economic and political significance.

### iii.   IEEPA Does Not Authorize the Challenged Orders.

66.    Even if IEEPA permits the imposition of tariffs by the President in certain circumstances, those circumstances were not met here because the Challenged Orders (a) do not involve an "unusual or extraordinary threat" to the nation; (b) do not "deal with"—meaning reasonably relate—to the national emergency declared by the President; (c) have been employed to take on numerous, unrelated problems for which no national emergency has been declared in the first place; and/or (d) are otherwise broader or outside the scope of the narrow delegated authority to impose tariffs.

67.    The Reciprocal Tariff Order do not concern any "emergency" or "unusual" or "extraordinary" threat.   The President's asserted basis for the Reciprocal Tariff Order is "persistent" "annual trade deficits." Reciprocal Tariff Order, 90 Fed. Reg. at 15,041.  The U.S. has maintained trade deficits, including with countries in the EU, dating back to before the enactment of IEEPA.  Indeed, the U.S. has enjoyed exceptional economic growth in the last 50 years.[6] Moreover, Congress passed a law to address a "large and serious balance-of-payments deficit" in Section 122 of the Trade Act of 1974, which unlike the authority asserted here explicitly permits tariffs but limits them to 15 percent and a duration of 150 days absent congressional approval.[7]

---

[6] *See* Andrea Freytag & Phil Levy, *The Trade Balance and Winning at Trade* (Oct. 3, 2024) (publicly available at https://www.cato.org/publications/trade-balance-winning-trade) (last accessed October 10, 2025).

[7] 19 U.S.C. § 2132.

68.     The tariffs imposed also bear little relation to the purported national emergency. Even if the tariffs could address a trade deficit, the Reciprocal Tariff Order imposes tariffs on a wide swath of countries with different trade profiles vis-à-vis the United States, including some with which the United States runs a trade surplus or that do not charge any tariffs for American goods.  Thus, the tariffs are simply not "reasonably related" to any asserted "emergency." *See United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 577 (C.C.P.A. 1975) (holding that tariffs under the TWEA must be "reasonably related" to the emergency that the President declared).

### iv.   Alternatively, IEEPA is an Unconstitutional Delegation.

69.     Article I, Section 1 of the Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1.

70.     "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States,* 488 U.S. 361, 371 (1989).

71.     Accordingly, any grant of regulatory authority to the executive branch must be accompanied by an "intelligible principle" that will form the basis of executive action. *See A.L.A. Schecter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).  "Congress must set forth standards sufficiently definite and precise to enable Congress, the courts, and the public to ascertain whether Congress's guidance has been followed."  *Gundy v. United States,* 588 U.S. 128, 158 (2019) (Gorsuch, J., dissenting) (quoting *Yakus v. United States,* 321 U. S. 414, 426 (1944)).

72.     Even if IEEPA did grant the President the authority to impose tariffs, it would constitute an unlawful delegation of legislative authority without the requisite intelligible governing principle.  Interpreting IEEPA to provide authority for frequent and significant changes to the tariff schedule would constitute a "sweeping delegation of legislative power" of the kind

rejected in previous Supreme Court cases. *See Indus. Union Dep't, AFL-CIO v. API*, 448 U.S. 607, 646 (1980); *see also Schecter Poultry*, 295 U.S. at 529 (holding that Congress "is not permitted to abdicate or transfer to other the essential legislative functions with which it is . . . vested").

73.     If something as longstanding and benign as bilateral trade deficits qualify as an "emergency" and as an "unusual and extraordinary threat," then there is no genuine, intelligible principle in IEEPA upon which to assess the President's adherence to Congress's guidance.

74.     The breadth of the tariff-imposition authority asserted under IEEPA—to impose tariffs at any rate on any country for any duration—counsels against reading IEEPA to confer such an extreme delegation of authority let alone one with intelligible guiding principles.

## CLAIMS FOR RELIEF

### COUNT I
### *ULTRA VIRES* ACTS IN VIOLATION OF THE INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT, 50 U.S.C. § 1702

75.     Plaintiffs reallege and incorporates herein by reference the foregoing Paragraphs of the Complaint as if fully set forth herein.

76.     The court has the ability to enjoin unconstitutional acts by state and federal officers. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Accordingly, "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).

77.     The Challenged Orders are *ultra vires* because, even in the face of an actual national emergency, IEEPA does not authorize the President to impose tariffs.

78.     Alternatively, the Challenged Orders are *ultra vires* because they do not constitute a genuine "emergency" or an "unusual" or "extraordinary" threat to national security, or the Challenged Orders are otherwise broader than the narrow delegation of tariff authority under IEEPA.

79.     For these reasons (or for any other reason that the Supreme Court or a binding decision of another court of competent jurisdiction may find), the Court should declare that the Challenged Orders (including any future amendments thereto) are *ultra vires* because they exceed the President's authority under IEEPA, and that the corresponding modifications to the HTSUS are unlawful.

80.     Because the Challenged Orders are *ultra vires*, and the corresponding modifications to the HTSUS are unlawful, they cannot be enforced by Defendants against Plaintiffs.  To the extent that the Challenged Orders have not already been permanently enjoined by another court as to Plaintiffs, this Court should accordingly enjoin Defendants, in their official capacities, from enforcing the Challenged Orders (including any future amendments thereto) against Plaintiffs.

81.     If the Challenged Orders are not declared *ultra vires* and the HTSUS modifications are not declared unlawful, Plaintiffs will suffer substantial injury, including irreparable harm.

82.     Plaintiffs are also entitled to an order directing Defendants to refund the tariffs paid as a result of their imposition by the unlawful Challenged Orders, on all relevant entries whether liquidated or unliquidated.

## <u>COUNT II</u>
## VIOLATION OF ARTICLE I, § 1 OF THE U.S. CONSTITUTION

83.     Plaintiffs reallege and incorporates herein by reference the foregoing Paragraphs of the Complaint as if fully set forth herein.

84.     To the extent IEEPA could be interpreted to permit the President to impose the tariffs as set forth in the Challenged Orders, that grant of authority violates Article I of the Constitution and the nondelegation doctrine.

85.     The authority to unilaterally impose and modify tariffs as asserted in the Challenged Orders would constitute an unconstitutional delegation of legislative authority to the executive branch, without—at a minimum—the requisite intelligible principle to cabin that authority.

86.     For these reasons, to the extent that IEEPA delegates to the President the authority to impose the tariffs set forth in the Challenged Orders and to the extent that the Challenged Orders have not already been permanently enjoined by another court as to Plaintiffs, this Court should declare that IEEPA violates Article I, §1 of the U.S. Constitution and is an unconstitutional delegation of legislative power.

87.     Additionally, to the extent that IEEPA unconstitutionally delegates to the President the authority to impose the tariffs set forth in the Challenged Orders and to the extent that the Challenged Orders have not already been permanently enjoined by another Court as to Plaintiffs, this Court should enjoin Defendants, in their official capacities, from enforcing the Challenged Orders (including any future amendments thereto) against Plaintiffs.

88.     If the Challenged Orders are not declared unlawful and enjoined, Plaintiffs will suffer substantial injury, including irreparable harm.

89.     Plaintiffs are also entitled to an order directing Defendants to refund the tariffs paid as a result of their imposition by the Challenged Orders, on all relevant entries whether liquidated or unliquidated.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Halstead New England Corporation, Metroflor Corporation, and shopHMTX LLC respectfully request that this Court enter an order and judgment:

    a.  enjoining Defendants and their agents, employees, and all persons acting under their direction or control from taking any action to collect any tariffs from Plaintiffs announced in the Challenged Orders (including any future amendments thereto);

b.   declaring that IEEPA grants the President no statutory authority to unilaterally impose tariffs;

c.   declaring that the Challenged Orders are unlawful;

d.   declaring that, if IEEPA grants the President the authority to impose the tariffs in the Challenged Orders, it constitutes an unconstitutional delegation of legislative power;

e.   awarding Plaintiffs, and ordering Defendants to promptly provide, a refund of the amount of any tariffs collected by Defendants pursuant to the Challenged Orders, including pre- and post-judgment interest, on all relevant entries whether liquidated or unliquidated; and

f.   grant any such other relief as this Court may deem just or proper.


Respectfully submitted,

Dated: December 22, 2025                     By:  */s/ Brian S. Janovitz*

**DLA PIPER LLP (US)**

Brian S. Janovitz
Elyssa Kutner
Caleb Roche
500 Eighth Street, NW
Washington, DC 20004
(202) 799-4373
brian.janovitz@us.dlapiper.com
elyssa.kutner@us.dlapiper.com
caleb.roche@us.dlapiper.com


*Attorneys for Plaintiffs*